# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  00-14034-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

      Plaintiff,

v.

BIAGIO ANTHONY MENTO,

      Defendant.

_____/



FILED by _____ D.C.

FEB 1 9 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON PETITION
## ALLEGING VIOLATIONS OF SUPERVISED RELEASE [D.E. #42]

    **THIS CAUSE** having come on to be heard for a final evidentiary hearing on February 10, 2015 in respect to the pending Petition Alleging Violations of Supervised Release [D.E. #42] and this Court having received testimony, evidence, and arguments of counsel, makes the following recommendation to the District Court:

1.    The Petition alleges two violations as follows:

| | |
|---|---|
| **Violation Number 1** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law.  On August 21, 2014, in Palm Beach County, Florida, the offender committed the following new law violations: 1) Dealing in stolen property, in violation of Florida Statute 812.019; 2) Fraud (false statement) verifying ownership to secondhand dealer, in violation of Florida Statute 538.04 4B.   On September 4, 2014, in Palm Beach County, Florida, the offender committed the following new law violations: 1) Dealing in stolen property, in violation of Florida Statute 812.019; 2) Fraud (false statement) verifying ownership to secondhand dealer, in violation of Florida Statute 538.04 4B. |
| **Violation Number 2** | **Violation of Standard Condition**, by failing to notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. On November 20, 2014, the defendant was questioned by a Town of Jupiter Police detective and he failed to advise his U. S. Probation Officer. |

2.      This Court stated that it would consider the evidence received by the Court at the Detention Hearing held on January 27, 2015 in respect to this Defendant. Both counsel for the government and counsel for the Defendant stated that they had no objection that the Court do so. Therefore, the facts set forth in that Detention Order will be incorporated into this Report and Recommendation. Omar Borges, the U. S. Probation who supervises the Defendant, testified at the Detention Hearing. He learned of the Defendant's arrest on or about November 28, 2014 via a text from the Palm Beach County Sheriff's Office. Upon return to his office, USPO Borges looked into the matter and found out that the Defendant had been arrested on November 26, 2014 in Jupiter, Florida, for pawning an item which allegedly did not belong to the Defendant. Also there were charges pending at that time against the Defendant in St. Lucie County, Florida, alleging grand theft. These grand theft charges were later dropped by the State Attorney's Office in St. Lucie County.

3.      USPO Borges testified that the Defendant never contacted him to advise USPO Borges that the Defendant had contact with law enforcement and/or had been arrested as required by the conditions of the Defendant's supervised release. USPO Borges also spoke with the Defendant's ex-girlfriend who informed him that the Defendant had lost his job and was no longer living with her at his approved residence.

4.      USPO Borges testified that he did have a face-to-face meeting with the Defendant on or about October 7, 2014. He last spoke with the Defendant on or about November 20, 2014, which was prior to his arrest on these pending state charges from which these violations arise. The Defendant never had any further contact with USPO Borges nor did he comply with the directions from USPO Borges to him that the Defendant needed to get

2

back to Martin County from Miami, find a residence, and contact USPO Borges. Apparently none of those things ever took place.

5.      USPO Borges testified that he has reviewed the pawn slips involving the alleged items that the Defendant pawned at a jewelry/pawn store. The Defendant utilized his driver's license which listed a previous residence in Jensen Beach, Florida, for purposes of that paperwork. This was not the Defendant's approved residence with the U. S. Probation Office. USPO Borges testified that the pawn slips reflect that on or about August 21, 2014 the Defendant pawned a 2-1/2 carat diamond for $5,000. Another pawn slip reflected that on or about September 4, 2014 the Defendant pawned the mounting ring with smaller diamonds in it for $1,000. USPO Borges has spoken with Mr. Schassberger who confirmed that the diamond and ring were his and were given to the Defendant to pass along to an individual named Ms. Mercer who was Mr. Schassberger's ex-fiancee. Mr. Schassberger told USPO Borges that this occurred in mid-August 2014. Mr. Schassberger told USPO Borges that at no time did he give the Defendant the authority to sell, pawn, or otherwise dispose of that ring in question. The Defendant was simply to pass the ring along to Ms. Mercer. Several attempts were made by Mr. Schassberger to meet with the Defendant to find out why the ring had not been given to Ms. Mercer. The Defendant failed to comply or meet with Mr. Schassberger.

6.      This is the sum and substance of the pertinent portions of the record of the Detention Hearing. This Court will now go into the evidence presented during the final evidentiary hearing on February 10, 2015.

7.      The government called Gordon Schassberger as its first witness. The government introduced Government's Exhibit No. 1 which is the pawn slip/record of Provident

3

Jewelry dated August 21, 2014, wherein the Defendant pawned the diamond for $5,000. His fingerprints and other pertinent identifying information are contained on the composite exhibit. Government's Exhibit No. 2 submitted at this hearing is the pawn receipt/record from Provident Jewelry dated September 4, 2014, wherein the Defendant sold the ring to Provident Jewelry for $1,000. Again the Defendant's fingerprint and other pertinent identifying information are contained on that document. Both exhibits were admitted into evidence without objection from the Defendant.

8.    Mr. Schassberger identified the Defendant in open court. He had known the Defendant for some two to three months at the time of this incident. He met the Defendant through a friend of Ms. Mercer. Ms. Mercer is Mr. Schassberger's ex-fiancee.

9.    Mr. Schassberger identified the photo contained in Government's Exhibit No. 3 as being a correct depiction of his mother's engagement ring which belongs to him. He testified that he gave it to Ms. Mercer as an engagement ring. When the engagement fell through, the ring was given back. Government's Exhibit No. 3 reflects the diamond out of the setting on the ring. Government's Exhibit No. 3 was admitted into evidence without objection.

10.    Government's Exhibit No. 8 is another photo of the same ring in its original condition with the diamond in the setting. It was admitted into evidence as Government's Exhibit No. 8 without objection.

11.    Mr. Schassberger does not know offhand the value of the ring. One time a jeweler said it was worth $15,000. Counsel for the Defendant objected to this hearsay testimony. The objection was overruled by the Court. Mr. Schassberger, as the owner of the item, could establish a value even though it does not appear to be critical to the issues that have to be decided by this Court in respect to these violations.

4

12.     Mr. Schassberger testified that in July of 2014 Ms. Mercer gave the ring back when they broke up.  He was living with Ms. Mercer at the time.  He moved out and lived for two to three months in a Holiday Inn in St. Lucie County.  The Defendant visited Mr. Schassberger at the Holiday Inn.  Mr. Schassberger said that he gave the ring in question to the Defendant to give to Ms. Mercer with the hope that the Defendant could get Ms. Mercer to come back to Mr. Schassberger.  Mr. Schassberger testified that at no time did he give the Defendant the ring as a gift.  The Defendant had no authority to sell it according to Mr. Schassberger.  The Defendant was only to give the ring to Ms. Mercer.

13.     Several weeks after giving the ring to the Defendant, Mr. Schassberger talked with Ms. Mercer.  He does not know the exact date.  This was concerning Mr. Schassberger having loaned the Defendant $400.  When Ms. Mercer found this out, she acknowledged that she had never received the ring from the Defendant.

14.     Ms. Mercer then called the police and made a report concerning the ring having been stolen by the Defendant.  Both Ms. Mercer and Mr. Schassberger gave statements to law enforcement.

15.     Mr. Schassberger testified that the Defendant made several promises to meet with he and Ms. Mercer and return the ring.  This never took place.  At no time did the Defendant tell Mr. Schassberger that he had in fact sold the ring.  The Defendant purportedly told Mr. Schassberger that it was in a safe deposit box and at one time said it was sent to Colorado for an appraisal.  There were other excuses that were given by the Defendant each time a meeting was set for the Defendant to return the ring.

16.     Apparently Mr. Schassberger and Ms. Mercer were on a cruise in July of 2014.  When that cruise ended, that is when he and Ms. Mercer broke up.  She then returned the

ring to Mr. Schassberger.   This is when Mr. Schassberger moved into the Holiday Inn referenced above.

17.   On cross-examination, Mr. Schassberger testified that the Defendant came to see him at the Holiday Inn to see how he was doing and what happened between he and Ms. Mercer.  This was when he gave the Defendant the ring to give to Ms. Mercer to try and get them back together.   Mr. Schassberger reasserted that the ring was not given to the Defendant for any other purpose other than to be given to Ms. Mercer.   Mr. Schassberger denies that he ever told the Defendant that he did not want the ring and simply gave it to the Defendant. He never told the Defendant he did not need the ring anymore. He never told the Defendant the relationship with Ms. Mercer was over.

18.   Apparently the Defendant met with Mr. Schassberger at the Holiday Inn four to five times after Mr. Schassberger had given the Defendant the ring.  They also had conversations over the phone.  The Defendant purportedly helped Mr. Schassberger get approval to move into an apartment somewhere.

19.   The date that Ms. Mercer reported the ring as being stolen was on or about October 26, 2014. Mr. Schassberger was never told by the Defendant that the ring had been stolen nor sold.  During the times that Mr. Schassberger and Ms. Mercer talked, the subject of the ring never came up until this conversation on or about October 26, 2014 between them which originally involved discussions concerning the $400 that Mr. Schassberger had loaned to the Defendant. It was at that time that Mr. Schassberger first learned that Ms. Mercer had not received the ring from the Defendant.

20.   Ms. Mercer manages Mr. Schassberger's finances and has done so for the last two to three years.  They have been on-again, off-again boyfriend/girlfriend for the last two

6

and one-half to three years.  He did hope that they would get back together again.  The Defendant told Mr. Schassberger that he would try his best to get them back together.

21.     After the cruise in July of 2014, Mr. Schassberger had conversations over the phone with Ms. Mercer, but the issue of the ring never came up.  He did have one face-to-face meeting with Ms. Mercer when they both went to Wal-mart to obtain insurance of some type for Mr. Schassberger.  Once again, the issue of the ring never came up.  It was during the October 2014 telephone conversation with Ms. Mercer that it was first learned that the ring was never given to her.

22.     The Court specifically asked Mr. Schassberger what the Defendant said at the time that the ring was given to him.  Mr. Schassberger testified that the Defendant asked for the ring and said he would see if he could get Mr. Schassberger and Ms. Mercer back together.  The Court asked this question after counsel for the government and Defendant had no further questions.  The Court needed to clarify certain testimony that had been given during the hearing.

23.     On cross-examination concerning the question raised by the Court, Mr. Schassberger testified that he pulled the ring out of his pocket to show the Defendant and the Defendant said give the ring to him and he would see if he could get them back together again. Mr. Schassberger admitted that he was upset at the time and was crying.  He said that he was in a bad state of mind.  He said he was a mess at that time.

_____

24.     Janet Mercer was the next witness called by the government.  She knows Gordon Schassberger.  She testified that she is his former fiancee.  They have been together since 2012 and have known each other for over thirty years.

25.     Ms. Mercer identified Government's Exhibit No. 3, which is the picture of the ring with the stone taken out of it and the stone shown separately.  She recalls that on July 28 or 29 of 2014 she gave that same ring back to Mr. Schassberger when they broke up after a cruise.

26.     Ms. Mercer knows the Defendant through a friend of hers.  She identified the Defendant in open court.  She first met the Defendant in January or February of 2014 at her friend's house.  She has seen him several times since then.

27.     She has never seen the Defendant and Mr. Schassberger together a lot, nor did she know of any dealings that they had with each other.  She did see Mr. Schassberger in October of 2014.   That was the first time she had a face-to-face meeting with Mr. Schassberger since the cruise that ended in July of that year.  Mr. Schassberger told Ms. Mercer that he had loaned someone some money.  After asking further, it was learned that he had loaned the Defendant $400.  This was in a telephone conversation between Mr. Schassberger and Ms. Mercer.  The following day, Ms. Mercer met with the Defendant and his girlfriend, who is Ms. Mercer's friend, and discussed the money.  The Defendant said that he would pay Mr. Schassberger back.

28.     Ms. Mercer then told Mr. Schassberger on the telephone that the Defendant had been in jail previously and was going to pay him back.  This was in October of 2014.  It was at that time that Mr. Schassberger said that he also had given the Defendant the engagement ring in question.

8

29.     Ms. Mercer, armed with this information, called her friend back and said that Mr. Schassberger had just told her that he had given the Defendant the engagement ring.  It was then reported to the police since the ring was never given to Ms. Mercer.  She and Mr. Schassberger gave statements to the police to the effect that the Defendant was to have given the ring to Ms. Mercer at Mr. Schassberger's direction.

30.     Subsequently, Ms. Mercer talked with the Defendant on the telephone several times.  There were calls back and forth trying to get the Defendant to return the ring to Mr. Schassberger.  Meeting times were set up and maybe a dozen times over a two to three week period, the Defendant failed to show as agreed.  The Defendant never came.  He always would call with some sort of an excuse.  One time he eventually did show up and had the $400 but not the ring.  Ms. Mercer then went to call the police.  She testified that the Defendant then waved the $400 at her, took it, and left the place where they were meeting.

31.     In her conversations with the Defendant, he never told Ms. Mercer that he had done anything with the ring except that he had sent it to Colorado for an appraisal.  The Defendant came up with many excuses as to why he did not have the ring in these conversations with Ms. Mercer.

32.     Government's Exhibit No. 7 is a composite exhibit which is a verbatim recitation of a text message the Defendant sent to Ms. Mercer and she received on her phone.  She knew it was from the Defendant by the phone number which sent it to her.  She recognized that phone number as being the Defendant's phone.  Government's Exhibit No. 7 was admitted into evidence without objection.

33.     Government's Exhibit No. 7 states as follows:

> "All my actions were from a temptation I couldn't resist.
> I am sorry for your heartache.  It wasn't supposed to be

this way when Gordon gave me the ring."

"Someday I hope you can forgive me and someday I
will attempt to make it up to you.  If that is anyway
possible.  I love Fontaine with the deepest parts of
my heart and I hurt her.  I could not resist the
temptation and I am truly sorry."

34.     Ms. Mercer testified that during the times that she saw the Defendant after she

broke up with Mr. Schassberger and prior to learning that the Defendant in fact had the ring,

the Defendant never mentioned that he had the ring nor that it had been given to him by Mr.

Schassberger.  The Defendant did ask her on these occasions if she and Mr. Schassberger

were getting back together.  She said that she did not think that was going to take place and

that they were not going to get back together.

35.     On cross-examination, Ms. Mercer testified that even after breaking up with Mr.

Schassberger, she continued to handle his financial affairs and helping him settle an estate.

She only had the one face-to-face meeting with him at Wal-mart.  The rest of their contacts

were over the telephone subsequent to their breakup in July of 2014.  They have spoken

maybe a dozen times after October 2014 when she learned that the Defendant had taken the

ring.  At no time was the ring ever mentioned during the telephone conversations or the time

that they met at Wal-mart or possibly at the dress shop that Ms. Mercer recalled during her

testimony.

36.     She first found out that the ring had been given to the Defendant on October 26,

2014.  It was on that date that she recalls Mr. Schassberger mentioning that to her.  She then

called the police.

37.     She  and  Mr.  Schassberger  have  been  going  back  and  forth  as

boyfriend/girlfriend for three years.  Then at this point during the testimony she stated that she

is his fiancee as opposed to not being his fiancee.  She also stated that she has given this ring back to Mr. Schassberger twice.  Once before the cruise and once subsequent to the cruise.

38.     After their last breakup in July of 2014 she asked Mr. Schassberger to move out and she put his stuff in a warehouse.  She at no time was involved with any dealings that Mr. Schassberger and the Defendant had concerning the ring nor their meetings at the Holiday Inn in that regard.  Later during her cross-examination she testified that she was not Mr. Schassberger's fiancee.  She stated at that time that she was simply here to try and get the ring back.

_____

39.     The next witness called by the government was Detective Eric Frank of the Jupiter Police Department.  His agency received a request for assistance from the St. Lucie County Sheriff's Office on or about November 19, 2014 in respect to the alleged theft of a ring.  Detective Morash of the St. Lucie County Sheriff's Office gave information to Detective Frank concerning the matter.  Detective Frank then left a message for the Defendant on the Defendant's phone for the Defendant to contact Detective Frank.

40.     Detective Frank visited Provident Jewelry Store where the items were sold by the Defendant.  Detective Frank identified Government's Exhibits Nos. 1 and 2 admitted into evidence.  He recognized those as the transactions from the Provident Jewelry Store.  He obtained these documents from Mr. Berman at that store.

41.     Government's Exhibit No. 4 admitted into evidence at this hearing without objection is the photo lineup from the Jupiter Police Department which contained a photo of

11

the Defendant. Mr. Berman viewed this photo lineup as indicated on the exhibit and identified the Defendant as the individual who had sold the items in question as specifically described in Government's Exhibits Nos. 1 and 2.

42.     Government's Exhibit No. 5 admitted into evidence without objection are copies of the information prepared by Mr. Berman regarding the identification of the Defendant as the individual who sold the items in question as more particularly described in Government's Exhibits Nos. 1 and 2.

43.     Government's Exhibit No. 6 was admitted into evidence at this hearing without objection.  It is a compact disk (CD) containing four telephone conversations between Detective Frank and the Defendant as recorded by Detective Frank.  He has reviewed those conversations and except for the order in which they took place, they do accurately represent the conversations between he and the Defendant.

44.     When he called the Defendant, he identified himself as Detective Frank with the Jupiter Police Department.  He told the Defendant that he was calling about the ring in question.  The Defendant said that he did get the ring from Mr. Schassberger to give to his ex-girlfriend.  He acknowledged that he did not give it and sold it instead.  Detective Frank requested the Defendant to come in and speak further.  The Defendant said he was in Miami at the time and would get back with Detective Frank.  When he did eventually get back with Detective Frank after three more telephone conversations, Detective Frank took the Defendant into custody.  He identified the Defendant in open court as the individual who he arrested on the state charges contained within Violation Number 1.

45.     Government's Exhibit No. 6 was played in open court.  On that CD the Defendant can be heard saying that Mr. Schassberger said to take the ring and give it to Ms.

Mercer when she said that she was ready to come back.  The Defendant said that Mr. Schassberger gave him the ring.  The Defendant is heard saying that he was now trying to buy the ring back from the jewelry store for Mr. Schassberger.  He understood that when Ms. Mercer was ready to get married, he was to give the ring to her.  The Defendant said that he had texts to show this.  No such texts were admitted from the Defendant or offered at this hearing.  Further, the conversations on Government's Exhibit No. 6 reflect the Defendant saying that Mr. Schassberger thought that Ms. Mercer was never going to come back to him nor did she ever say that she wanted the ring.  The Defendant reaffirmed that he was still trying to buy the ring back but he did not have any money to do so.

46.     The Defendant is also heard on Government's Exhibit No. 6 saying that he told Mr. Schassberger and Ms. Mercer that the ring was in Colorado for an appraisal as a "stall tactic."  The Defendant did set up a meeting for him to come in the following Monday to meet with Detective Mercer.   There were telephone calls back and forth as reflected on Government's Exhibit No. 6 when the Defendant is heard asking Detective Frank if he is going to be arrested on this charge when he comes in and if he could simply pay Mr. Schassberger and have this all taken care of.  When he eventually did come in to the Jupiter Police Department he was arrested as referenced above.  Detective Frank believes this was on or about November 25, 2014.

47.     It is also interesting that during the conversations heard on Government's Exhibit No. 6, the Defendant is heard saying that Mr. Schassberger should not have given the ring to him and that the Defendant should not have taken it.

48.     Detective Frank charged the Defendant with two counts of dealing in stolen property concerning the separate sales of the ring and stone to Provident Jewelry.  He was

also charged with two counts of giving a false statement regarding ownership of those items. On cross-examination Detective Frank testified that he did not charge the Defendant with grand theft because those acts occurred in St. Lucie County.

49.     When asked by counsel for the Defendant, Detective Frank read from the certification on the bottom of Government's Exhibits Nos. 1 and 2 which acknowledges that the Defendant, as the seller, did sell, transfer and assign all rights to the property in question to Provident Jewelry. Further, the certification as can be read on the bottom of the front page of each of Exhibits Nos. 1 and 2 state that the Defendant as seller represents and warrants that he sold the property which was not stolen, rented or leased, and that the property has no liens or encumbrances against it. The Defendant asserts in that certification that he is the rightful owner of the property and has the right to sell the property. The certification goes on, but those are the pertinent portions which are germane to the issues before the Court.

_____

50.     The next witness called by the government was Detective William Morash of the St. Lucie County Sheriff's Department. He became involved in this case after Mr. Schassberger made a report to a patrol deputy in October of 2014. He contacted Mr. Schassberger and Ms. Mercer concerning the ring. He was told by Mr. Schassberger that he and Ms. Mercer had broken up and he was staying at the Holiday Inn in St. Lucie County. Mr. Schassberger told Detective Morash that the Defendant came to the hotel and Mr. Schassberger gave him the ring to give to Ms. Mercer. The Defendant never did give the ring to Ms. Mercer. That was when the report was made to law enforcement.

51. Detective Morash was given the Defendant's telephone number. He called the Defendant with Mr. Schassberger and Ms. Mercer present. He gave the Defendant the option of returning the ring. Mr. Schassberger said that he wanted to move on and not press charges at that time if the ring could be returned.

52. In response, the Defendant told Detective Morash that he would return the ring and a meeting was set up at a Publix on Prima Vista Boulevard and U. S. 1 in Port St. Lucie. The Defendant told Detective Morash that he was nervous to meet with Mr. Schassberger. Detective Morash said that if he was nervous, that he should simply call to have a law enforcement officer present at that meeting. Detective Morash was not involved further with any meetings between the Defendant and Mr. Schassberger.

53. Detective Morash received a call from Mr. Schassberger that the meeting never took place. Detective Morash has never met with the Defendant.

54. Through the use of various databases which the St. Lucie County Sheriff's Office utilizes, a pawn transaction or sale was located in Palm Beach County on or about September 4, 2014. It was determined that this was one of the transactions where the Defendant sold the ring to Provident Jewelry.

55. Detective Morash let Ms. Mercer and Mr. Schassberger know what he had found from the database and that it appeared that the ring in question had been sold. Mr. Schassberger then went to the jewelry store and identified the ring. The remainder of the case was turned over to Detective Frank since that was taking place in Palm Beach County.

56. Detective Morash obtained a warrant for grand theft in St. Lucie County. Those charges were later dropped by the State Attorney's Office. He does not know the specific reason why.

15

57.    The government then rested its case.

_____

58.    The Defendant presented no witnesses or evidence at the hearing.

59.    After both parties had rested, it was determined that in respect to Violation Number 2, the Court should hear from USPO Borges once again.  Therefore, USPO Borges was sworn and did testify.  He stated that he never received any telephone calls from the Defendant after his arrest by the Jupiter Police Department in respect to the charges contained within Violation Number 1 set forth in the Petition.  He did speak with the Defendant about being in Miami and the Defendant having moved without approval from his approved residence.  On or about November 28, 2014, the Defendant left a voice message for USPO Borges.  USPO Borges retrieved that when he returned to his office on or about that date.

60.    USPO Borges testified that he did not have any further contact with the Defendant after November 20, 2014.  A message was left for USPO Borges by the Defendant saying that he was back at his girlfriend's house.  This was November 24th or 25th.  According to USPO Borges, at the time that this voice message was left by the Defendant, the Defendant had already been contacted by Detective Frank of the Jupiter Police Department.  The Defendant never advised USPO Borges of this contact nor his arrest.  This is what gives rise to Violation Number 2 set forth in the Petition according to USPO Borges.

## ANALYSIS

61.    At the conclusion of the evidentiary hearing, this Court afforded counsel for the government and counsel for the Defendant the opportunity to provide written briefs which would be considered by this Court prior to making its final decision.  This Court has received

16

those briefs from counsel for the government and counsel for the Defendant. They have been reviewed and the arguments made therein have been considered by the Court.

62.     The only parties to the transfer of possession of the ring were Mr. Schassberger and the Defendant. The only evidence before this Court is the testimony of Mr. Schassberger, the owner of the ring. He asserts unequivocally that he gave the ring to the Defendant for the sole purpose of giving it to Ms. Mercer. The testimony of Mr. Schassberger was that he at no time gave the Defendant legal title to the ring nor did he authorize the Defendant to sell the ring.

63.     The evidence before this Court is that the Defendant did in fact sell the stone and the ring to Provident Jewelry on separate dates as more particularly set forth in the factual portion of this Report and Recommendation. The exhibits entered into evidence memorialized these transactions. He retained the funds received from Provident Jewelry. By doing so, the Defendant unlawfully converted the property of Mr. Schassberger to the Defendant's own use.

64.     The cases cited by the Defendant in his post-hearing Memorandum are distinguishable. Those cases involved workers who were provided funds to perform certain tasks for homeowners. Those workers then failed to completely perform those tasks and retained the funds. The Defendant asserts that those cases stand for the proposition that conversion of that property does not constitute theft since the defendants in those cases had no intent to deprive the owner of the funds at the time that the funds were given to them. The Defendant argues that he had no criminal intent at the time he received the rings and therefore cannot be found to have violated his supervised release in that respect as alleged in the Petition.

17

65.     Those cases are clearly distinguishable from the facts before the Court here. The Defendant was given possession of the ring and not legal title to the ring. He was given possession of the ring with the express purpose of transferring that ring to Ms. Mercer on behalf of Mr. Schassberger to help them "get back together." The Defendant later decided to sell the ring and the stone. It is not necessary that the Defendant have the intent to permanently deprive Mr. Schassberger at the time of the original transfer of possession from Mr. Schassberger. It is sufficient that there is evidence the Defendant later formed the necessary criminal intent to convert the ring to his own use by selling it and retaining the proceeds of sale.

66.     The recorded telephone calls between the Defendant and Detective Frank further confirmed that the Defendant knew what he did was wrong. He stated to Detective Frank that he received the ring to give to Ms. Mercer on behalf of Mr. Schassberger. He admitted selling the ring and said he wished he had not done that. He also asked Detective Frank if he could pay the money to Mr. Schassberger to avoid criminal charges. He also said he was trying to raise money to buy back the ring.

67.     The Defendant also admitted that he made up the story about the ring being sent to Colorado for appraisal simply to stall Mr. Schassberger's attempt to get the ring returned. The Defendant failed to show at several scheduled meetings to return the ring to Mr. Schassberger. It is clear by the circumstantial evidence presented in this case that the Defendant not only knew that his acts of selling the ring and stone were wrong, but that he was doing his best to stall Mr. Schassberger to enable the Defendant to raise enough money to buy the ring and the stone back. This is also confirmed in his telephone conversations with Detective Frank and text messages to Ms. Mercer.

18

68.     The evidence also establishes that the Defendant certified on the pawn/sale documents he executed at Provident Jewelry that he had full ownership and authority to dispose of those items.  He clearly did not.  He at no time had legal title to the ring and stone. He had mere possession of those items with the express purpose of delivering them to Ms. Mercer.  There is no evidence before this Court that the ring was given to the Defendant as a gift nor that he was otherwise given the authority to dispose of the ring as he wished.

69.     The second violation set forth in the Petition relates to the Defendant failing to advise his U.S. Probation Officer of his contact with law enforcement.   The evidence establishes that the Defendant had contact with Detective Frank from about November 20, 2014 until November 25, 2014 when he was arrested by Detective Frank at the Jupiter Police Department.  At no time did he ever advise his U. S. Probation Officer of this contact.   The testimony of USPO Borges was that he never received any communication from the Defendant about his contacts and eventual arrest in this matter concerning the ring. USPO Borges learned of the Defendant's arrest on or about November 28, 2014 by a text message from the Palm Beach County Sheriff's Office.

70.     Revocation proceedings such as this are not part of a criminal prosecution.  A court may revoke the term of a supervised releasee if it finds by a preponderance of the evidence that the person violated a condition of supervised release as set forth in the Petition filed herein.  All which is required is that the evidence reasonably satisfy the court that the conduct of the releasee has not been as good as required by the conditions of supervised release. . Evidence that would establish guilt beyond a reasonable doubt is not required. United States v. Zayas, 146 Fed. Appx. 346 (11th Cir. 2005).  See also United States v. Cunningham, 607 F.3d 1264 (11th Cir. 2010).

19

71.     The testimony of Mr. Schassberger as owner of the ring is sufficient to establish ownership, value and his intent in transfer of possession to the Defendant for the sole purposes of giving it to Ms. Mercer.  His testimony and the documentary evidence support the conclusion that the Defendant took possession of the ring and later formed an intent to sell the ring for himself. His actions deprived Mr. Schassberger of the ring and converted the ring to cash which the Defendant kept.  This evidence is sufficient to support a finding that the government has established each of the violations by a preponderance of the evidence.  It is not necessary that the Defendant be convicted of the underlying state offenses which are still pending.  See United States v. Fiore, 405 Fed. Appx. 417 (11th Cir. 2010).

72.     Based upon the totality of the evidence presented to this Court, this Court finds that the Defendant did in fact deal in property which was unlawfully taken from Mr. Schassberger's legal possession.  It is sufficient that the Defendant's criminal intent was formed subsequent to physical possession of the ring having been given to him by Mr. Schassberger for the sole purpose of giving it to Ms. Mercer.  The Defendant, by his actions of selling the ring to Provident Jewelry, exhibited the intent to permanently deprive Mr. Schassberger, and for that matter Ms. Mercer, of all right, title and interest to the ring.  There is no evidence before this Court that the Defendant at any time had the legal title to the ring such as would give him an ownership interest and the right to dispose of the ring.

73.     By selling the ring and stone to Provident Jewelry, the Defendant was transferring and dealing in an item of property to which he had no legal title nor authority to sell. His transfer to Provident Jewelry was fraudulent as is evidenced by the exhibits entered into evidence in this case wherein he certified to have legal authority and legal ownership to transfer the ring and the stone.

74.    The uncontroverted evidence also establishes that the Defendant at no time advised his U. S. Probation Officer of his contact with law enforcement on November 20 - 25, 2014.  He is required to so advise his probation officer within seventy-two (72) hours.  He failed to do so. USPO Borges learned of the Defendant's arrest on November 28th via a communication from the Palm Beach County Sheriff's Office.

75.    Based on all of the foregoing, this Court finds that the government has established by a preponderance of the evidence each of the two violations set forth in the Petition.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant be found to have violated his supervised release in respect to Violation Number 1 and Violation Number 2, and that a sentencing hearing be set at the District Court's earliest convenience for final disposition of this matter.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, the United States District Judge assigned to this case.  Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.

**DONE AND SUBMITTED** this _19th_ day of February, 2015, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

21

Copies furnished:
Hon. K. Michael Moore
AUSA Diana M. Acosta
AFPD Fletcher Peacock
U.S. Probation (USPO Borges)
U.S. Marshal